# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| **LUIS VIRAMONTES,** | |
| **Petitioner,** | Case No. 18 cv 04929 |
| **v.** | Judge Mary M. Rowland |
| **STEPHANIE DORETHY, Warden, Pontiac Correctional Center,** | |
| **Respondent**. | |

## MEMORANDUM OPINION & ORDER

After discovering that his wife was having an affair with a former coworker, Luis Viramontes beat his wife, and she later died from her injuries. At trial, Viramontes admitted to causing the injuries that led to his wife's death, but claimed he was seriously provoked by her infidelity, and that she willingly engaged in aggression against him. A jury convicted Viramontes of first degree murder and he was sentenced to 25 years in prison. Viramontes has now filed a petition for a writ of habeas corpus, 28 U.S.C. § 2254, challenging his conviction. In his petition, he presents a single ineffective assistance of counsel claim and requests an evidentiary hearing. (Dkt. 1 at 1, 27) For the reasons that follow, Viramontes' petition [1] is denied, and the Court issues a certificate of appealability. The Court declines to grant an evidentiary hearing.

# **BACKGROUND**

When considering habeas petitions, federal courts must presume that the factual findings made by the last state court to decide the case on the merits are correct, unless the petitioner rebuts those findings by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Coleman v. Hardy*, 690 F.3d 811, 815 (7th Cir. 2012). Viramontes has not provided clear and convincing evidence to rebut the presumption of correctness here, so this factual background is taken from the state court's findings. *People v. Viramontes*, 2016 IL App (1st) 160984.

## 1. Trial

At trial, Viramontes testified that on January 9, 2010, he and his wife, Sandra Rincon-Viramontes, went out for dinner and drinks with family and friends to celebrate his birthday. Sandra's mother watched their two children for the evening and planned on returning the children home the next morning. The birthday festivities ended around 11 p.m. On the drive home, Viramontes noticed that Sandra received a text message, which he thought was strange given the late hour. Sandra fell asleep in the car, and when they arrived home, Viramontes carried her inside and put her to bed. When he returned to the car for their belongings, he checked Sandra's phone and saw sexually explicit text messages between Sandra and "Denise."

Viramontes testified that, unknown to him at the time, Sandra was having an extramarital affair with Andres (Andy) Ochoa, a former coworker. Sandra saved Andy's phone number in her cell as "Denise." On the night in question, January 9, 2010, Sandra and Andy exchanged eighteen text messages. Viramontes saw that

Sandra and Andy discussed meeting, and Andy requested that Sandra send him photographs. In reply, Sandra sent four or five naked pictures of herself.

Viramontes further testified that when he saw the messages and photographs, he "felt like [his] whole life was turned upside down." *People v. Viramontes*, 2016 IL App (1st) 160984, ¶ 8. He tried calling "Denise's" number to discover who Sandra had been texting, but no one answered. Viramontes testified that when he saw a text from "Denise" saying "you're making me hard," he knew "Denise" was a man and that Sandra was having an affair. *Id.*

Viramontes then went into the house to confront Sandra about the affair. He testified that he found her in the bathroom snorting cocaine, and they argued about the drugs. Viramontes asked Sandra about the naked photographs and text messages. Sandra told Viramontes that "Denise" was Andy, they were having an affair, and they were in love.

Viramontes testified that he was "angry" and "devastated." *People v. Viramontes*, 2016 IL App (1st) 160984, ¶ 10. He hit Sandra in the face with an open hand. Sandra ran into the bedroom and locked the door. He continued to yell at Sandra, calling her vulgar names and reading the text messages aloud. Viramontes ran to the basement, grabbed a can of spray paint, and spray painted their wedding pictures and the living room and hallway walls with explicit words relating to the affair. He then sat at the kitchen table, put his head down, and cried.

Sandra eventually came out of the bedroom. When she saw the spray-painted walls, she ran towards Viramontes screaming and swinging at him. She began to hit

him in the chest, so he grabbed Sandra's shoulders, "threw her against the door, and then tossed her over the table." *People v. Viramontes*, 2016 IL App (1st) 160984, ¶ 11. He told Sandra he was leaving her. She got up and ran at him again. Viramontes grabbed her by the shoulders, threw her against the refrigerator and then onto the kitchen floor, telling her "Get off me. Leave me. I'm leaving you. I'm not going to be with you no more." *Id*. Viramontes began walking towards the backdoor.

Sandra got up from the floor, threw her wedding rings at Viramontes, and said she did not want to be married. She also told him, "I don't want to have no more kids with you, that's why I killed your baby. I had an abortion and killed your baby." *People v. Viramontes*, 2014 IL App (1st) 130075, ¶ 15. Viramontes testified he thought he had facilitated the abortion because he drove her to a doctor's appointment he thought was related to her cancer diagnosis. He testified he "lost it" and "couldn't control [himself] after that." *People v. Viramontes*, 2016 IL App (1st) 160984, ¶ 12. Viramontes grabbed Sandra and threw her into the refrigerator, causing her to hit her head hard. He then threw her on the floor, where she hit her head again. On the floor in the fetal position, Sandra tried to cover herself as Viramontes hit her in the face with his hands four or five times.

At trial, Viramontes testified that although he hit and threw Sandra, he was not trying to kill her. He noted that he was close to potential weapons, including kitchen knives, but did not use any because, as he put it, "I wasn't trying to kill her." *People v. Viramontes*, 2016 IL App (1st) 160984, ¶ 13. Viramontes went outside to

calm down and texted "Denise," who did not answer. Around 2:30 a.m., he called his brother Fernando and asked him to come over.

When Viramontes went back in the house, Sandra was in bed. He asked her if she was alright. She responded, "Babe, I'm sorry," to which he replied he was sorry too. *People v. Viramontes*, 2016 IL App (1st) 160984, ¶ 14. Viramontes testified that she asked him to lie next to her and he did. He claimed she hugged him and told him she loved him. Viramontes testified that he tried to comfort her and then she went to sleep.

Viramontes' brother, Fernando, testified he arrived at the house shortly after 3 a.m. He looked in the bedroom and saw Sandra sleeping. He maintained that she did not look hurt and he thought she was sleeping off her intoxication. He did not notice her breathing unusually and did not believe she needed medical attention. When Fernando asked Viramontes what happened, Viramontes seemed confused and repeated the same phrase over and over: "I trusted her, I trusted her." *People v. Viramontes*, 2016 IL App (1st) 160984, ¶ 15. Viramontes told Fernando that he hit Sandra with his hands. Fernando testified he suggested Viramontes lie down with Sandra and comfort her. Fernando slept in a separate bedroom.

Viramontes woke Fernando around 7:30 a.m. and told him that Sandra was breathing differently. Sandra's breathing was heavy and she was mumbling. Fernando noticed redness on her face, shoulders, and chest, and he saw blood on the mirror and bed sheet. Viramontes told Fernando to call an ambulance, which he did.

Sandra was taken to the hospital by ambulance. In the emergency room, she was unable to communicate. Photographs were taken of her injuries and extensive bruising. Sandra had no fractures or injuries to her internal organs, other than her brain. The toxicology reports were positive for a high level of cocaine.[1] Sandra was put on life support and remained in a coma. After doctors informed her family that she would not recover, her family removed her ventilator. Sandra died on January 31, 2010. Viramontes turned himself into the police on January 13, 2010.

Before trial, the State argued a motion *in limine*, asking the court to allow testimony from two witnesses who said they saw Viramontes hit Sandra on other occasions and saw her with black eyes. The motion was denied with respect to the black eyes as there was evidence that Sandra had been involved in a car accident in the same period of time. But the motion was granted with respect to the alleged hitting for the limited purpose of showing intent. At trial, the State presented only one of their witnesses, Liliana Almazan. Almazan had a child with Sandra's brother. She described her relationship with Sandra as that of a sister. A year before Viramontes and Sandra were married, Almazan attended a party at their home and was sitting in front of the house with Sandra when Viramontes walked down the stairs and "slapped her upside the head." *People v. Viramontes*, 2016 IL App (1st) 160984, ¶ 20. Almazan testified that Viramontes did not say anything to Sandra but he looked upset.

---

[1] Viramontes' Petition states that at the emergency department records showed that Sandra tested positive for cocaine at a concentration of 31,208 nanograms per milliliter, "which was over 100 times the cut off level for the test." (Dkt. 1 at 13)

Before Almazan testified, defense counsel sought to introduce photographs during cross-examination showing injuries Viramontes' niece, Crystal Viramontes, sustained during a fight with Almazan. The State acknowledged Almazan had a misdemeanor conviction related to the fight but objected to it being raised on cross-examination. When asked about the relevance of the fight, defense counsel said, "It goes to show her motives to lie. The fact that she's engaging in the battery of a member of the defendant's family. You have to understand the context of this. [Almazan] has a child with the brother of the alleged victim in this matter and both sides have been very hostile toward one another. This will go right to her motive and bias to lie." *People v. Viramontes*, 2016 IL App (1st) 160984, ¶ 21. The court prohibited the defense from cross-examining Almazan about the fight, but allowed defense counsel to make it part of the record.

The State presented two expert witnesses. Dr. David McElmeel, the hospital trauma and surgical critical care attending physician, testified that when Sandra was admitted, he saw multiple bruises on Sandra's body, decreased consciousness, and severe edema or swelling of the brain. He found bilateral subdural hematomas (an accumulation of blood on the brain's surface) from blunt head trauma; bruising around her forehead, eyes, nose, arms, shoulders, chest, hands, and hip; and lacerations on the bridge of her nose, her forehead, and her right ankle. Dr. McElmeel explained that Sandra suffered significant trauma and that severe force had to have been applied to cause her injuries. Regarding the toxicology screen for cocaine, Dr. McElmeel testified cocaine did not contribute to, or cause, Sandra's death.

On cross-examination by defense counsel, Dr. McElmeel acknowledged that Sandra's urine toxicology screen was positive for a high level of cocaine.[2] She had high blood pressure when she arrived at the hospital, and he agreed that the high blood pressure could have been related to cocaine toxicity or her head injury. Dr. McElmeel also acknowledged that Sandra had no trauma to her neck; no internal injuries to her chest, abdomen, or back; and no facial or skull fractures.

Dr. Michael Humilier performed Sandra's autopsy. He testified that Sandra had 27 external evidences of injury and extensive bruising covering almost every body surface. He found a subdural hemorrhage, a collection of blood under the skull between the layers of tissue surrounding the brain, and cerebral edema, swelling of the brain. Dr. Humilier testified that the force had to be significant to inflict the devastating injuries, something appreciably more severe than banging her head against the wall. In Humilier's opinion, the cause of death was bronchopneumonia due to blunt force trauma from the assault. He ruled the death a homicide. He also testified that the drug overdose did not contribute to Sandra's death.

On cross-examination by defense counsel, Dr. Humilier agreed that cocaine can cause cerebral edema (which he found in Sandra's head), subarachnoid hemorrhage (which he did not find), as well as respiratory problems, elevated blood pressure, and convulsions. He confirmed that hospital records showed Sandra had cocaine in her system when she was admitted, and that he could not determine whether the bruising on Sandra's body, aside from injuries to her head, occurred during the fight with

---

[2] See, *supra*, note 1.

Viramontes or at the hospital. Dr. Humilier also acknowledged that he did not find any fractured bones or any injuries to Sandra's internal organs.

Before closing arguments, defense counsel requested jury instructions on several lesser included offenses, including second degree murder based on provocation. Defense counsel argued that sufficient evidence existed for provocation based on the adultery and mutual combat. The State countered that the case did not fit into any of the four categories meriting a second degree murder instruction. The court agreed. Defense counsel also sought instructions on involuntary manslaughter, domestic battery, and aggravated battery. The court denied these as well.

The jury convicted Viramontes of first degree murder. The trial court sentenced Viramontes to 25 years in prison. Viramontes' posttrial motion for a new trial was denied.

## 2. Direct Appeal

Viramontes appealed his conviction. Appellate counsel, who was the same attorney as trial counsel, argued that the trial court (1) should have given a second degree murder instruction as the naked photographs and text messages equate to personal discovery of the adulterous act itself and warrant a provocation instruction; (2) should have granted his request for instructions on involuntary manslaughter, aggravated battery, and domestic battery; (3) should not have allowed the jury to see two autopsy photographs of his wife's head injuries, which he claimed were unduly prejudicial and inflammatory; and (4) improperly limited his cross-examination of Liliana Almazan, which might have revealed bias or motive to lie. The appellate court

affirmed Viramontes' conviction and sentence. *People v. Viramontes,* 2014 IL App (1st) 130075.

Viramontes filed a petition for leave to appeal (PLA) with the Illinois Supreme Court on March 25, 2015. The Court denied his PLA. *People v. Viramontes*, No. 118632 (Ill. 2015).

## 3. Post-Conviction

Viramontes timely filed a petition for postconviction relief through private counsel. He alleged (1) he was denied effective assistance of trial counsel when trial counsel failed to call an expert witness on the issue of the force necessary to cause Sandra's injuries and the effects of cocaine; (2) his trial counsel was ineffective for failing to make a proper offer of proof that would have persuaded the trial court to allow Crystal Viramontes to testify and impeach Almazan's testimony; (3) the trial court's refusal to issue an involuntary manslaughter instruction violated his rights to due process and a jury trial; (4) he was denied his right to a fair trial because the trial court admitted into evidence irrelevant and prejudicial text messages between him and his wife;[3] (5) his appellate counsel was ineffective for failing to argue the trial court erred in admitting Viramontes' text message testimony; (6) his appellate counsel was ineffective for failing to properly argue that the trial court's refusal to give an involuntary manslaughter instruction violated his rights to due process.

---

[3] On cross-examination, Viramontes admitted sending Sandra text messages on the night he beat her asking, "Do you have a problem with me?" *People v. Viramontes*, 2016 IL App (1st) 160984, ¶ 18.

In support of his petition, Viramontes attached two affidavits, one from Dr. Larry Blum and one from Crystal Viramontes. Dr. Blum, a board certified forensic pathologist, reviewed the trial testimony, Sandra's medical records, the postmortem report, and autopsy photographs. Dr. Blum concluded that Dr. Humilier's testimony—that it would take a "relatively significant force" to inflict the injuries seen in Sandra's brain—was "not necessarily true." *People v. Viramontes*, 2016 IL App (1st) 160984, ¶ 29. Dr. Blum asserted that cerebral edema, or brain swelling, can be associated with even a mild brain injury, and that the amount of the cerebral edema found in a patient at the time of death is not necessarily proportional to the blunt force used to inflict the initial injury. Thus, according to Dr. Blum, even a relatively minor injury to the brain can potentially cause significant and fatal cerebral edema. Dr. Blum also stated that cocaine can contribute to cerebral edema.

Dr. Blum also claimed that the bruising on Sandra's face and body did not contribute in any significant way to her death. He also stated that it is difficult to assess the amount of force used to inflict those bruises because bruising varies significantly between individuals based on a number of factors. Dr. Blum noted that Sandra had Hodgkin's lymphoma and that complications from, and treatment for, lymphoma can increase bleeding and bruising. He stated that the volume of blood in Sandra's hematoma, as described by Dr. Humilier, was relatively small and would not necessarily be lethal. Also, according to Dr. Blum, the existence of a subdural hematoma in the brain is not necessarily indicative of injury from a "significant force." *People v. Viramontes*, 2016 IL App (1st) 160984, ¶ 30

Dr. Blum stated that although Dr. Humilier and Dr. McElmeel used the term "significant force," the evidence did not show that Sandra sustained scalp lacerations, skull fractures, or other injuries typically seen with blunt force trauma. Additionally, Sandra was responsive immediately after the beating and did not have fractures, "which strongly suggests that her initial injury, although clinically significant, could have been caused by something less than 'significant' blunt force." *People v. Viramontes*, 2016 IL App (1st) 160984, ¶ 31. Dr. Blum ultimately concluded that Sandra's injuries were not severe enough to infer that Viramontes intended to either kill her or cause her death.

In Crystal Viramontes' affidavit, she explained that she was close to Sandra and never saw Viramontes act violently toward her. In June of 2010, after Viramontes was released on bond, Almazan attacked Crystal, saying she was "going to make [Viramontes] and [Crystal] pay dearly for what [Viramontes] did to Sandra." *People v. Viramontes*, 2016 IL App (1st) 160984, ¶ 32. Almazan subsequently attacked Crystal again, making further statements concerning her hatred for Viramontes. Almazan was prosecuted and spent time in jail for both attacks. Crystal never spoke to Viramontes' attorney, but before trial she did tell Viramontes' about the attacks and thought he would inform his attorney about them. She was told she may be called to testify at trial but she was not.

The trial court summarily dismissed Viramontes' postconviction petition as "frivolous and patently without merit or barred by *res judicata*." *People v. Viramontes*, 2016 IL App (1st) 160984, ¶ 33.

The appellate court affirmed the dismissal of Viramontes' postconviction petition. On appeal, Viramontes argued that trial counsel was ineffective for failing invesitigate and call an expert to testify to the amount of force necessary to cause Sandra's injuries. He asserted that the degree of force necessary to cause Sandra's injuries was determinative of whether he had the requisite knowledge or intent for a first-degree murder conviction. The state appellate court concluded that trial counsel's performance was not deficient because "[Viramontes'] attorney cross-examined the State's expert witnesses on most of the issues Dr. Blum discusses" in his affidavit. *People v. Viramontes*, 2016 IL App (1st) 160984, ¶ 52. The appellate court also found that Viramontes was not prejudiced because the evidence against him was "overwhelming" in light of his own testimony and admissions as to the severity of the beating. *Id.* at ¶¶ 53-56.

Viramontes filed a postconviction PLA with the Illinois Supreme Court raising the same claims. The court denied his PLA. *People v. Viramontes*, No. 122856 (Ill. 208).

## **LEGAL STANDARD**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, a state petitioner seeking a writ of habeas corpus in federal court must first exhaust the remedies available to him in state court, 28 U.S.C. § 2254(b)(1)(A), "thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Cheeks v. Gaetz*, 571 F.3d 680, 685 (7th Cir. 2009) (internal quotation marks omitted). To properly exhaust a

claim, a petitioner must fully and fairly present federal claims through one complete round of the state appellate review process before filing a federal habeas petition. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999).

If a habeas petitioner successfully runs the procedural-default gauntlet, then a federal court may consider the merits of his federal habeas claims. But under AEDPA, a federal court may not grant habeas relief unless the state court's decision "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or the state court decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2). But just because a federal court independently concludes that the relevant state court decision applied clearly established law erroneously does not mean that the court may grant the writ; rather, the state court's application must be objectively unreasonable. *Lockyer v. Andrade*, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 155 L. Ed. 24 144 (2003). "This is a difficult standard to meet; 'unreasonable' means 'something like lying well outside the boundaries of permissible differences of opinion.'" *Jackson v. Frank,* 348 F.3d 658, 662 (7th Cir. 2003) (quoting *Hardaway v. Young*, 302 F.3d 757, 763 (7th Cir. 2002)).

## <u>ANALYSIS</u>

### A. Ineffective Assistance of Counsel

Viramontes' habeas petition argues that trial counsel was ineffective for failing to call an expert to testify regarding the force necessary to cause the victim's injuries.

This claim has not been procedurally defaulted, as it was brought through a complete round of state court review. Accordingly, the Court will address the merits of Viramontes' ineffective assistance of counsel claim.

To receive habeas relief on the merits of an ineffective assistance of counsel claim, Viramontes must meet the familiar performance-and-prejudice standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 647 (1984). Under *Strickland*, Viramontes must show that (1) his attorney's performance fell below an objective standard of reasonableness and (2) he was prejudiced by that deficient performance. *Id.* at 687-88. To satisfy the second element, Viramontes must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Overall, judicial review of trial counsel's performance "must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight." *Id.* at 689; *see also United States v. Lathrop*, 634 F.3d 931, 937 (7th Cir. 2011).

On habeas review, the inquiry is doubly deferential: not only must the Court presume that "the challenged action might be considered sound trial strategy," *Strickland*, 466 U.S. at 689 (internal quotation marks omitted), but under AEDPA this Court must also defer to the state court's application of *Strickland* unless it is objectively unreasonable. *See Knowles v. Mirzayance*, 556 U.S. 111, 123, 129 S. Ct. 1411, 173 L. Ed. 2d 251 (2009). To be clear, the Court is not deciding whether the state court's determination was correct under *Strickland,* but rather whether it

"produced an answer within the range of defensible positions." *Taylor v. Bradley*, 448 F.3d 942, 948 (7th Cir. 2006) (internal quotation marks omitted). "[B]ecause the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles*, 556 U.S. at 123.

Here, the Illinois Appellate Court held that trial counsel's performance was not deficient based on the fact that trial counsel "cross-examined the State's expert witnesses on most of the issues Dr. Blum discusses" in his affidavit. The court noted that "[o]n cross-examination, the State's experts acknowledged that Sandra did not have broken bones; that she tested positive for cocaine, which can cause cerebral edema; and that her bruising may have been caused by her cancer diagnosis." *People v. Viramontes*, 2016 IL App (1st) 160984, ¶ 52. The testimony elicited on cross-examination, the appellate court concluded, was sufficient to present the alternate theory to the jury that Sandra had not been severely beaten, but had signs of cocaine toxicity which caused her death. *Id*. However, the appellate court noted that "the jury opted not to accept that theory, and [Viramontes], with the benefit of hindsight, wants to argue that the jury might have decided otherwise if his attorney had presented and [sic] expert witness … 'Dr. Blum's testimony amounts to nothing more than second-guessing counsel's performance, which *Strickland* strongly cautions the court to avoid.'" *People v. Viramontes*, 2016 IL App (1st) 160984, ¶ 52.

Furthermore, the appellate court noted that trial counsel has a professional duty to conduct reasonable investigations and independently investigate any possible

defense. *People v. Viramontes*, 2016 IL App (1st) 160984, ¶ 56 (citing *Strickland*, 466 U.S. at 691). But the appellate court reasoned that trial counsel's cross-examination of expert witnesses regarding the types of injuries Sandra suffered and the possible effects of cocaine in exacerbating those injuries show that trial counsel engaged in a reasonable investigation of Viramontes' case and all of his defenses. Ultimately, the appellate court concluded that trial counsel's "decision to elicit testimony on cross-examination of the State's experts did not constitute ineffective assistance of counsel." *People v. Viramontes*, 2016 IL App (1st) 160984, ¶ 56.

In addition to concluding that Viramontes failed to establish deficient performance, the appellate court concluded that Viramontes failed to establish prejudice. Viramontes argued that the lack of expert testimony prevented him from receiving an involuntary manslaughter instruction and an acquittal. *People v. Viramontes*, 2016 IL App (1st) 160984, ¶ 53. The appellate court disagreed, finding that the trial court's decision regarding an involuntary manslaughter instruction was "not rooted solely in the State's medical testimony regarding the nature of the victim's injuries but was also based on other factors such as the disparity between [Viramontes] and the victim." *Id*. Thus, the appellate court could not conclude that an introduction of an expert would have changed the trial court's mind about giving an involuntary manslaughter instruction. *Id*.

The appellate court further held, that in light of "overwhelming evidence" of Viramontes' guilt, "he cannot establish that it is arguable the outcome of the trial would have been different if his attorney had presented expert medical testimony."

*People v. Viramontes*, 2016 IL App (1st) 160984, ¶ 54. In particular, the appellate court relied on the fact that Viramontes testified as to the severity of the beating. *Id.* Viramontes testified that he threw Sandra against a door, over the table, and into the refrigerator, causing her to hit her head "really hard." *Id.* While Sandra was on the floor in the fetal position, Viramontes hit her in the face four or five times. *Id.* Given Viramontes' incriminating testimony, the appellate court concluded that Viramontes was not prejudiced by trial counsel's failure to call an expert witness. *Id.* at ¶ 56.

The Illinois Appellate Court's determination was neither contrary to nor an unreasonable application of Supreme Court precedent. The appellate court expressly cited *Strickland* and applied that standard in a thorough and reasonable manner. It was not objectively unreasonable for the appellate court to conclude that Viramontes' trial counsel's performance was reasonable, or that Viramontes was not prejudiced by counsel's performance given that counsel elicited similar testimony on cross-examination of the states' witnesses. This Court disagrees, however, that evidence against Viramontes was "overwhelming," as the jury initially indicated in a note that it was divided six-six; there was evidence of significant cocaine toxicity in Sandra's bloodstream; that she bruised easily as a result of her cancer diagnosis and treatment; and that she was responsive immediately after the beating. The Court is not convinced that the facts at trial presented "overwhelming evidence" that Viramontes had the mental state necessary for a first degree murder conviction.

However, on habeas review, the question is not whether the state court's determination was correct under *Strickland,* but rather whether the state court

"produced an answer within the range of defensible positions." *Taylor*, 448 F.3d at 948 (internal quotation marks omitted). The state court has done so here. Given the deferential standard of review under AEDPA, the Court finds the state appellate court's decision reasonable. Accordingly, Viramontes' ineffective assistance of counsel claim fails.

## B. Evidentiary Hearing

Petitioner requests an evidentiary hearing. (Dkt. 1 at 1, 27) However, Viramontes has provided no arguments in either his habeas petition or his Reply as to why an evidentiary hearing is necessary or appropriate. AEDPA governs the availability of an evidentiary earing on federal habeas review, and generally bars them except in narrow exceptions. *See* 28 U.S.C. §§ 2254(e)(2)(A), (B). Section 2254(e)(2)'s bar only applies when the failure to develop the factual basis for a claim is attributable to the petitioner. *Ward v. Jenkins*, 613 F.3d 692, 698 (7th Cir. 2010). That is not the case here. There is no indication that Viramontes failed to develop the factual basis for his claim, let alone that any failure was his fault.

With AEDPA posing no bar, a petitioner is entitled to an evidentiary hearing in federal court if (1) he has alleged facts which, if proved, would entitle him to habeas relief and (2) the state courts, for reasons beyond his control, never considered his claim in a full and fair hearing. *Ward*, 613 F.3d at 698 (citing *Davis v. Lambert*, 388 F.3d 1052, 1059-60 (7th Cir. 2004)). Viramontes has provided no arguments regarding these requirements. Regardless, based on the record before the Court,

these requirements have not been met. Viramontes' request for an evidentiary hearing is denied.

## C. Certificate of Appealability

If Viramontes wishes to appeal this denial, he must first obtain a certificate of appealability. Under 28 U.S.C.§ 2253, "an appeal may not be taken to the court of appeals from the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a state court" unless the circuit justice or judge first issues the certificate. 28 U.S.C.§ 2253(c)(1)(A). A certificate of appealability may issue only when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C.§ 2253(c)(2). To make a substantial showing, a petitioner must show that "reasonable jurists could debate whether…the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (internal quotation marks and citations omitted). The Court issues a certificate of appealability on Viramontes' ineffective assistance of counsel claim because it believes that reasonable jurists could differ on the question of the state appellate court's reasonable application of *Strickland*.

## CONCLUSION

For the reasons discussed above, Viramontes' habeas petition (Dkt. 1) is denied, and the Court issues a certificate of appealability. The Court declines to grant an evidentiary hearing.

E N T E R:

Dated: January 14, 2020

_____
MARY M. ROWLAND
United States District Judge